UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION


UNITED STATES OF AMERICA, )
)
            Plaintiff, )
)
        v. ) No. S1-4:07 CR 175 JCH
) DDN
MICHAEL SHANAHAN, SR., )
MICHAEL SHANAHAN, JR., and )
GARY C. GERHARDT, )
)
            Defendants. )

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

Before the court are certain motions of defendants Michael Shanahan, Sr., Michael Shanahan, Jr., and Gary C. Gerhardt, to dismiss the original and superseding indictments (Docs. 38, 39, 106). These motions were referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b).

**I. SUPERSEDING INDICTMENT**

The superseding indictment charges defendants Michael Shanahan, Sr., Michael Shanahan, Jr., and Gary C. Gerhardt, with conducting a scheme to defraud shareholders of Engineered Support Systems, Inc. (ESSI) and the investing public between 1996 and August 2006. (Doc. 52 at ¶ 10.) During that time, the defendants were corporate officers of ESSI, a publicly traded company.[1] (Id. at ¶¶ 1, 2.) Michael Shanahan, Sr., served as the Chief Executive Officer of ESSI, Gary Gerhardt served as the Chief Financial Officer, and Michael Shanahan, Jr., served as a member of the Board of Directors and as a member of the Compensation Committee. (Id. at ¶ 1.)

The superseding indictment allegations describe the purpose and process for issuing stock options, and notes the reporting requirements governing publicly traded companies. (Id. at ¶¶ 4-9.) In describing the scheme to defraud, the superseding indictment charges the defendants with backdating stock options - misrepresenting to the public the values

_____

[1]In January 2006, ESSI was purchased by DRS Technologies, Inc. (Doc. 52 at ¶ 2.)

at which the options were granted. (Id. at ¶ 10.) In the backdating of the options, the superseding indictment alleges the defendants received illicit proceeds, failed to report the illicit proceeds as taxable income, caused ESSI to understate its compensation expenses and overstate its net income, and deprived investors of accurate compensation information. (Id. at ¶ 11.)

The superseding indictment's allegations describe the dates and stock prices corresponding to the backdating scheme. (Id. at ¶¶ 14-17.) As a consequence of the scheme involving option backdating, the superseding indictment alleges the defendants filed documents with the Securities and Exchange Commission (SEC), which contained materially false statements. (Id. at ¶¶ 18-22.) These SEC filings, along with the backdating scheme, form the foundation of each of the twelve counts against the defendants.

In Count I, the superseding indictment charges the defendants with conspiracy to create false records, make false statements in documents filed with the SEC, and commit mail and wire fraud against ESSI, DRS Technologies, and the shareholders and investing public of each company, all in violation of 18 U.S.C. § 371. (Id. at ¶¶ 23-25.) In Count II, the superseding indictment charges the defendants with creating false corporate records of ESSI, in violation of 15 U.S.C. § 78m(b)(2) and 18 U.S.C. § 2. (Id. at ¶¶ 26-27.) In Counts III, IV, and V, the superseding indictment charges the defendants with making false statements in documents filed with the SEC, in violation of 15 U.S.C. § 78ff and 18 U.S.C. § 2. (Id. at ¶¶ 28-33.) In Counts VI, VII, VIII, and IX, the superseding indictment charges the defendants with mail fraud, in violation of 18 U.S.C. §§ 1341, 1346, and 18 U.S.C. § 2. (Id. at ¶¶ 34-41.) Finally, in Counts X, XI, and XII, the superseding indictment charges the defendants with wire fraud, in violation of 18 U.S.C. §§ 1343, 1346, and 18 U.S.C. § 2. (Id. at ¶¶ 42-47.)

## II. MOTIONS TO DISMISS

The defendants move to dismiss the superseding indictment as legally insufficient because of fatal defects in the grand jury

proceedings (Doc. 38) and because of ambiguity in the underlying accounting pronouncements (Docs. 39, 106). [2]

To be legally sufficient on its face, the indictment, in a plain, concise, and definite written statement, must contain all the essential elements of each offense charged, must fairly inform the defendant of the charges against which he must defend, and must allege sufficient information to allow the defendant to plead a conviction or an acquittal as a bar to a future prosecution. See U.S. Const. amends. V and VI; Fed. R. Crim. P. 7(c)(1); Hamling v. United States, 418 U.S. 87, 117 (1974); United States v. Sewell, 513 F.3d 820, 821 (8th Cir. 2008). An indictment should not be read in a hyper-technical fashion; it should be deemed sufficient "unless no reasonable construction can be said to charge the offense." United States v. O'Hagan, 139 F.3d 641, 651 (8th Cir. 1998). An indictment is normally sufficient if its language tracks the language of the relevant statute. Sewell, 513 F.3d at 821. In determining whether an indictment is subject to dismissal, the allegations contained in the indictment are accepted as true. United States v. Farm & Home Sav. Ass'n, 932 F.2d 1256, 1259 n.3 (8th Cir. 1991).

### III.  DISCUSSION
### A.  Grand Jury Proceedings

Defendant Gerhardt argues that the government failed to request and present exculpatory evidence to the grand jury. He argues this omission misled and misinformed the grand jury, and was the product of unintentional prosecutorial misconduct. Had this exculpatory information been presented to the grand jury, Gerhardt claims the indictment would not have been returned. Indeed, he argues there was insufficient competent evidence to support the indictment, and urges the court to dismiss the indictment. (Doc. 41.)

---

[2]Defendants' motions to dismiss the indictment because of a conflict of interest (Docs. 44 under seal, 112 under seal) and for an evidentiary hearing on the conflict issue (Doc. 112 under seal) will be treated in a separate Report and Recommendation.

To dismiss an indictment on grounds of prosecutorial misconduct, the defendant must show that misconduct substantially influenced the grand jury's decision to indict, or that there is a grave doubt as to whether the decision to indict was free from substantial influence of prosecutorial misconduct. Bank of Nova Scotia v. United States, 487 U.S. 250, 259, 263 (1988). The defendant must also show he was prejudiced by the misconduct. Id. at 263.

The grand jury serves as a buffer or referee between the government and the people. United States v. Williams, 504 U.S. 36, 47 (1992). In this role, nevertheless, the grand jury is not an adjudicatory body - it is an accusatory body. Id. at 51. It sits "not to determine guilt or innocence, but to assess whether there is adequate basis for bringing a criminal charge." Id. Given this function, a suspect under investigation does not have the right to testify before the grand jury or to have exculpatory evidence presented on his behalf. Id. at 52. Requiring the prosecutor to present exculpatory evidence in his possession "would be incompatible with [the grand jury] system." Id.

Defendant Gerhardt argues that the government failed to request and present exculpatory evidence to the grand jury. Under Williams, the government has no obligation to present exculpatory evidence to the grand jury. Id. As a result, the grand jury is not misled or misinformed when the prosecutor fails to disclose exculpatory evidence. See United States v. Mahalick, 498 F.3d 475, 479-80 (7th Cir. 2007).

Defendant Gerhardt also argues there was insufficient competent evidence to support the indictment. Looking to the history and purpose of the grand jury system, this argument fails. "[P]ermitting defendants to challenge indictments on the ground that they are not supported by adequate or competent evidence . . . would run counter to the whole history of the grand jury institution, in which laymen conduct their inquiries unfettered by technical rules." Costello v. United States, 350 U.S. 359, 364 (1956). A contrary rule would allow defendants to insist on a preliminary trial to determine the adequacy of the evidence before the grand jury, creating incalculable delay. Id. at 363. Federal courts are not permitted to test the evidence supporting an indictment from an unbiased grand jury. United States v. Adamo, 742

F.2d 927, 939 (6th Cir. 1984); United States v. Williams, No. CR 406-186, 2006 WL 3218704, at *1 (S.D. Ga. Nov. 3, 2006). An indictment, valid on its face and returned by an unbiased grand jury, is "immune from attack by a claim that there was insufficient competent evidence presented to the grand jury." United States v. Johnson, No. 4:05 CR 719 CEJ MLM, 2006 WL 156712, at *2 (E.D. Mo. Jan. 20, 2006), adopted by, No. 4:05 CR 719 CEJ (E.D. Mo. Feb. 6, 2006).

Grand jury proceedings are afforded a strong presumption of regularity, and a defendant faces a heavy burden to overcome this presumption. United States v. Wadlington, 233 F.3d 1067, 1073 (8th Cir. 2000). In this case, defendant Gerhardt does not claim the grand jury was biased and does not attack the superseding indictment on its face. Instead, he speculates that, had exculpatory information been presented, the grand jury would not have returned the indictment. As noted above, the prosecutor has no obligation to present exculpatory evidence to the grand jury, and a federal court may not test the evidence supporting an indictment returned by an unbiased grand jury.

The motion to dismiss the superseding indictment because of fatal defects in the grand jury proceedings should be denied.

## B. Accounting Principles Board Opinion No. 25

The defendants attack the superseding indictment as unconstitutionally vague. They argue that Accounting Principles Board Opinion No. 25 (APB 25) serves as the foundation of the prosecution's case, and that the government could not have charged the defendants without relying on APB 25. Defendants argue that, since APB 25 is a vague and ambiguous standard, the prosecution cannot use the rule as the basis for criminal liability, and the indictment therefore must be dismissed. In support of this position, the defendants point to the SEC's subsequent clarification of APB 25, asserted widespread misapplication of APB 25 by various corporations, and the decision In re Sportsline.com Securities Litigation. (Docs. 40, 110, 129, 148.)

**Background on Stock Options**

On March 18, 2006, the <u>Wall Street Journal</u> published an article analyzing how certain companies were granting stock options to their executives. <u>See</u> Charles Forelle and James Bandler, <u>The Perfect Payday</u>, Wall St. J., March 18, 2006, at A1; (Doc. 110, Ex. 15.) According to the article, companies issued a suspiciously high number of options at times when the stock price hit a periodic low and then was followed by a sharp price increase. <u>In re Zoran Corp. Derivative Litig.</u>, 511 F. Supp. 2d 986, 996 (N.D. Cal. 2007). The odds of these well-timed grants occurring by chance alone were astronomical - less likely than winning the lottery. <u>Id.</u> "Eventually it was determined that such buy-low-sell-high returns simply could not be the product of chance." <u>Id.</u>

In testimony before the United States Senate Committee on Banking, Housing, and Urban Affairs, Professor Erik Lie identified three potential strategies to account for these well-timed stock option grants. (Doc. 110, Ex. 11 at 4.) The first strategy included techniques called "spring-loading" and "bullet-dodging." <u>Id.</u> The practice of "spring-loading" involved timing a stock option grant to immediately precede an announcement of good news. <u>Id.</u> The practice of "bullet-dodging" involved timing a stock option grant to immediately follow an announcement of bad news. <u>Id.</u> A second strategy included manipulating the flow of information - timing corporate announcements to match known future grant dates. <u>Id.</u> A third strategy, backdating, involved cherry-picking past, and relatively low, stock prices to be the official grant date. <u>Id.</u>; <u>see also</u> <u>In re CNET Networks, Inc.</u>, 483 F. Supp. 2d 947, 950 (N.D. Cal. 2007) ("Backdating occurs when the option's grant date is altered to an earlier date with a lower, more favorable price to the recipient.").

A company grants stock options to its officers, directors, and employees at a certain "exercise price," giving the recipient the right to buy shares of the stock at that price, once the option vests. <u>In re Zoran</u>, 511 F. Supp. 2d at 996. If the stock price rises after the date of the grant, the options have value. <u>Id.</u> If the stock price falls after the date of the grant, the options have no value. <u>Id.</u> Options with an exercise price equal to the stock's market price are called "at-

the-money" options.  <u>Id.</u>  Options with an exercise price lower than the stock's market price are called "in-the-money" options.   <u>Id.</u>   By granting  "in-the-money" options, or backdated options, a company effectively grants an employee an instant opportunity for profit.  <u>In re Openwave Sys. Sec. Litig.</u>, 528 F. Supp. 2d 236, 241 (S.D.N.Y. 2007).

Granting backdated options has important accounting consequences for the issuing company.  <u>Id.</u>  "For financial reporting purposes, companies granting in-the-money options have to recognize compensation expenses equal to the difference between the market price and the exercise price."  <u>In re Zoran</u>, 511 F. Supp. 2d at 996.  APB 25 is the accounting rule that governed stock-based compensation (through June 2005), and which required companies to recognize this compensation expense for backdated options.  <u>In re Openwave</u>, 528 F. Supp. 2d at 242. For options granted at-the-money, a company did not have to recognize any compensation expenses under APB 25.  <u>Id.</u>; <u>In re Zoran</u>, 511 F. Supp. 2d at 996.

Backdating stock options is not illegal.  As the SEC Commissioner Paul Atkins explained, "the mere fact that options were backdated does not mean that the securities laws were violated.  Purposefully backdated options that are properly accounted for and do not run afoul of the company's public disclosure are legal." (Doc. 110, Ex. 1 at 6.)  On the other hand, fraudulent backdating, or backdating options "in contravention of the company's public disclosure [and] to avoid recognizing compensation expenses" is fraud. (<u>See id.</u>); <u>see also</u> <u>In re CNET Networks</u>, 483 F. Supp. 2d at 956 ("Intentionally employing hindsight to adjust the grant date to an advantageously low price, or 'backdating,' is fraud.").[3]

A motive for fraudulent backdating may be to avoid recognizing a compensation expense, or a "hit to the earnings," all the while awarding

---

[3]The term "backdating" seems to have been given varying definitions.  For purposes of clarity, this memorandum opinion will use the term "innocent backdating" to refer to in-the-money options that have been properly accounted for and which do not run afoul of a company's public disclosure.  The opinion will use the term "fraudulent backdating" to refer to in-the-money options that have not been properly accounted for and which run afoul of a company's public disclosure.

in-the-money options.  <u>In re Zoran</u>, 511 F. Supp. 2d at 996; <u>In re CNET Networks</u>, 483 F. Supp. 2d at 956.  To accomplish the fraud, those responsible assign an earlier date to the stock options - a date where the stock price was attractively low - and pretend the option was awarded  on that earlier date, rather than the real date.  <u>In re Zoran</u>, 511 F. Supp. 2d at 996-97.  In other words, fraudulent backdating disguises in-the-money options (which require recognizing compensation expenses) as at-the-money options (which do not require recognizing compensation expenses).  <u>See</u> <u>id.</u>  The paperwork and phony grant dates allow the company to avoid compensation expenses, all the while aware that the "price on the true grant date, of course, is higher than the price on the phony grant date."  <u>Id.</u> at 997.

After 2002, a company's ability to fraudulently backdate option grants became much more difficult.  <u>In re Openwave</u>, 528 F. Supp. 2d at 242 n.3.  On August 29, 2002, Congress passed the Sarbanes-Oxley Act, which instituted new reporting requirements for stock option grants.  <u>Id.</u>  Before Sarbanes-Oxley, an employee who received a stock option grant had to file financial forms with the SEC within forty-five days after the company's fiscal year end.  <u>Id.</u>  After Sarbanes-Oxley, an employee must file financial forms with the SEC within two days of receiving the stock option grant.  <u>Id.</u>  After Sarbanes-Oxley, a company fraudulently backdating stock options by a few weeks or months would not have the required SEC forms filed on time, raising red flags with the SEC.  <u>In re Zoran</u>, 511 F. Supp. 2d at 1006.


**Vagueness Challenge**

In this case, the defendants argue that APB 25 is so vague and ambiguous that the application of the federal criminal statutes in the superseding indictment would violate due process.

The void for vagueness doctrine stems from the Due Process Clause of the Fifth Amendment.  U.S. Const. amend. V; <u>Connally v. Gen. Constr. Co.</u>, 269 U.S. 385, 391 (1926).  Under the doctrine, "a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process

of law." Connally, 269 U.S. at 391.  Criminal laws must give the person
of ordinary intelligence a reasonable opportunity to know what conduct
is prohibited.  United States v. Washam, 312 F.3d 926, 929 (8th Cir.
2002).  "[N]o man shall be held criminally responsible for conduct which
he could not reasonably understand to be proscribed."  United States v.
Lanier, 520 U.S. 259, 265 (1997).

    To determine whether the legal basis for a criminal prosecution is
unconstitutionally vague, the court must determine whether the legal
standard: (1) provides adequate notice of the proscribed conduct, and
(2) does not lend itself to arbitrary enforcement.  Washam, 312 F.3d at
929.  A legal standard may be unconstitutionally vague on its face, or
as applied to a particular circumstance.  United States v. Forbes, 806
F. Supp. 232, 237 (D. Colo. 1992).  Vagueness challenges that do not
involve the First Amendment must be examined "in the light of the facts
of the case at hand."  United States v. Mazurie, 419 U.S. 544, 550
(1975); Washam, 312 F.3d at 929.


**APB 25**

    As noted above, a company granting at-the-money options did not
have to recognize a compensation expense.  In re Zoran, 511 F. Supp. 2d
at 996.  But a company granting in-the-money options had to recognize
compensation expenses equal to the difference between the market price
and the exercise price.  Id.; In re CNET Networks, 483 F. Supp. 2d at
955.  While the company sets the exercise price, the market price is
determined by looking to the option's "measurement date."  In re CNET
Networks, 483 F. Supp. 2d at 949, 955.  Paragraph 10(b) of APB 25
defines the measurement date.  Id. at 955.  According to APB 25.10(b),

> The measurement date for determining compensation cost in
> stock option, purchase, and award plans is the first date on
> which are known both (1) the number of shares that an
> individual employee is entitled to receive and (2) the option
> or purchase prices, if any.  That date for many or most plans
> is the date an option or purchase right is granted or stock
> is awarded to an individual employee. . . .  However, the
> measurement date may be later than the date of grant or award
> in plans with variable terms that depend on events after date
> of grant or award.

> Thus a corporation recognizes compensation cost for stock issued through compensatory plans unless the employee pays an amount that is at least equal to the quoted market price of the stock at the measurement date.

(Doc. 110, Ex. 2 at 5.)

To be sure, the definition of measurement date may be unclear in some situations. In re CNET Networks, 483 F. Supp. 2d at 955; see also United States v. Reyes, No. C 06-556 CRB, 2007 WL 1574540, at *3 (N.D. Cal. May 30, 2007) ("[T]he precise timing of a grant is not always easy to discern."). Indeed, on September 19, 2006, the Chief Accountant of the SEC, Conrad Hewitt, issued a letter identifying a few instances where a company could use the wrong measurement date without rising to the level of fraud. In re CNET Networks, 483 F. Supp. 2d at 955; (Doc. 110, Ex. 13.) For instance, administrative delays, oral approval of grants, grants to still-unknown recipients, or grants to recently hired employees could all lead to confusion about the correct measurement date. (Doc. 110, Ex. 13); Reyes, 2007 WL 1574540, at *3; In re CNET Networks, 483 F. Supp. 2d at 955. That being said, "[i]n most instances, the determination of the measurement date of a stock option involves little or no uncertainty." (Doc. 110, Ex. 13 at 4.)

In this case, the undersigned believes that APB 25 is not so ambiguous or vague that the superseding indictment should be dismissed. The superseding indictment alleges the defendants engaged in a scheme to fraudulently backdate stock options, so that the options would be in-the-money when issued, despite public representations that the options were issued at-the-money. (Doc. 52 at ¶ 10.) Because of these misrepresentations, the superseding indictment alleges that ESSI's total compensation expenses were understated, while its net income was overstated. (Id. at ¶ 11.) The superseding indictment alleges the defendants fraudulently backdated options on at least eight occasions. (Id. at ¶ 14.)

On these occasions, the defendants are alleged to have approved stock option awards, selected exercise dates that corresponded to periodic lows in the stock prices, and then "caused administrative assistants to backdate award letters enclosing stock options, making it appear as though the options had been sent on earlier dates." (Id. at

¶ 15.)  In other words, the superseding indictment alleges that the defendants issued themselves in-the-money options, and then disguised those options as at-the-money options by having assistants assign earlier, and phony, grant dates to the award letters.  The superseding indictment alleges that Shanahan, Sr. signed the stock options and the award letters.  (Id.)

The superseding indictment further alleges that the defendants caused ESSI to file several documents with the SEC that contained false statements.  (Id. at ¶ 18.)  According to the superseding indictment, these documents and reports "falsely stated that the Company's options were issued 'at the money' when, in truth and fact, the options were issued 'in the money'. . . ."  (Id.)  The superseding indictment alleges that ESSI's registration statements, filed with the SEC, specifically stated that the company's stock options "were granted, or would be granted, 'at the money.'"  (Id. at ¶ 22.)

In the context of these allegations, the superseding indictment charges the defendants with conspiracy, creating false records, making false statements in SEC filings, mail fraud, and wire fraud.  (Id. at ¶¶ 23-47.)  The superseding indictment does not charge the defendants with violating APB 25.  The superseding indictment does even mention APB 25.  (See id.)[4]

Nonetheless, the indictment implicitly relies on APB 25, because APB 25 is the rule that compelled companies to account for compensation expenses for in-the-money grants.  APB 25 is also the rule that allowed companies not to account for compensation expenses for at-the-money grants - which provided one of the incentives for fraudulent backdating. This does not, however, mean the superseding indictment is unconstitutionally vague.  In this case, the allegations in the superseding indictment do not fall anywhere near the type of situations that could produce unclear measurement dates.  "Whatever ambiguity may exist in APB 25, it is not possible to construe the rule's language as

---

[4]A grand jury indictment does not have to allege a violation of accounting principles when alleging securities fraud.  United States v. Ebbers, No. S4 02 CR 1144 (BSJ), 2005 WL 22878, at *1 (S.D.N.Y. Jan. 4, 2005), aff'd, 458 F.3d 110 (2d Cir. 2006).

permitting the deliberate retroactive selection of a particular grant date and the intentional concealment of the date on which that retroactive selection was made." Reyes, 2007 WL 1574540, at *3. Clearly APB 25 prohibits companies from deliberately choosing an exercise price based on a historic low, and then disguising in-the-money options to look like at-the-money options. See id. This is precisely the conduct alleged by the superseding indictment.

**Misapplication of APB 25**

The defendants argue that widespread misapplication of APB 25 proves the accounting rule is ambiguous.[5] After the Wall Street Journal ran "The Perfect Payday" article, a number of public companies were forced to restate their earnings, several corporate executives resigned, and the SEC began investigating the options granting practices of various companies. In re Openwave, 528 F. Supp. 2d at 242. By one estimate, over 250 companies were implicated, in some fashion, by the backdating scandal. (Doc. 129, Ex. 4.) Even within the St. Louis metropolitan area, defendants argue, ESSI was not the only company subject to federal investigation for fraudulent backdating. (Doc. 129, Ex. 11.)

None of this however, speaks to whether the superseding indictment is unconstitutionally vague as applied to the defendants in the superseding indictment. See Mazurie, 419 U.S. at 550. In Mazurie, the Supreme Court noted that vagueness challenges must be examined "in the light of the facts of the case at hand." Id. The facts surrounding the options-granting practices of other corporations or the circumstances of other federal investigations therefore provide no proof that the superseding indictment is unconstitutionally vague as applied to these defendants.

**In re Sportsline.com**

---

[5]The defendants note that they are not making a selective prosecution argument. (Doc. 148, Ex. 1 at 35.)

The defendants argue that the <u>In re Sportsline.com</u> case proves that APB 25 is unconstitutionally vague. In that case, the court found that "the interpretations of the measurement date criteria embodied in APB No. 25 are far from obvious," and dismissed the lawsuit for failure to state a claim. <u>In re Sportsline.com Sec. Litig.</u>, 366 F. Supp. 2d 1159, 1168-69, 1174 (S.D. Fla. 2004).

<u>In re Sportsline.com</u> is distinguishable for several reasons. As an initial matter, <u>In re Sportsline.com</u> involved a civil complaint subject to the heightened pleading requirements of the Private Securities Litigation Reform Act. <u>Id.</u> at 1162. Unlike the superseding indictment, the plaintiffs' complaint alleged several violations of APB 25, but never alleged that the company's officers and directors were aware of the violations - only that they should have known about the violations. <u>Id.</u> at 1173. Most importantly, <u>In re Sportsline.com</u> is not a fraudulent backdating case; the case does not contain a single reference to backdating. <u>See</u> <u>id.</u> In any event, the undersigned has noted that the definition of measurement date may be unclear in some situations. But as noted above, for purposes of the conduct alleged in the superseding indictment, APB 25 is sufficiently clear to survive the motion to dismiss.

### IV.  RECOMMENDATION

For the reasons set forth above,

**IT IS HEREBY RECOMMENDED** that the motions of defendant Gary C. Gerhardt to dismiss the indictment because of defects in the grand jury proceedings (Doc. 38) and to dismiss the indictment because of fundamental ambiguity in the underlying accounting pronouncements (Doc. 39) be denied.

**IT IS FURTHER RECOMMENDED** that the joint motion of defendants Michael F. Shanahan, Sr., Michael F. Shanahan, Jr., and Gary C. Gerhardt to dismiss the superseding indictment because of fundamental ambiguity in the underlying accounting pronouncements (Doc. 106) be denied.

The parties are advised they have ten days to file written objections to this Report and Recommendation. The failure to file timely written objections may result in a waiver of the right to appeal issues of fact.

/S/ David D. Noce
                         **UNITED STATES MAGISTRATE JUDGE**

Signed on March 31, 2008.